INDUSTRIAL RISK INSURERS *v.* HARTFORD
STEAM BOILER INSPECTION AND
INSURANCE COMPANY
(SC 17186)

Norcott, Palmer, Vertefeuille, Zarella and Mack, Js.

Argued September 24, 2004—officially released March 15, 2005

*Ernest J. Mattei*, with whom were *Daniel J. Foster* and, on the brief, *Deborah S. Russo*, for the appellant (defendant).

*Linda L. Morkan*, with whom were *Timothy W. Regan*, *Troy J. Seibert* and, on the brief, *Kevin E. Majewski*, for the appellee (plaintiff).

*Opinion*

PALMER, J. The defendant, Hartford Steam Boiler Inspection and Insurance Company (Hartford Steam Boiler), appeals from the judgment of the trial court denying its motion to vacate an arbitration award and granting the application of the plaintiff, Industrial Risk Insurers (Industrial Risk), to confirm the award.[1] On appeal, Hartford Steam Boiler claims that the trial court improperly granted Industrial Risk's application to confirm the award because the award is unsupported by the undisputed evidence. We reject this claim and, accordingly, affirm the judgment of the trial court.

The following facts and procedural history are relevant to our resolution of this appeal. Industrial Risk insured Allegheny Powers Systems, Inc. (Allegheny), an electric power utility company, under a comprehensive property insurance policy. Thereafter, Industrial Risk purchased reinsurance from Hartford Steam Boiler with respect to the boiler and machinery portion of the policy that Industrial Risk had issued to Allegheny. Under the terms of that reinsurance contract, Hartford Steam Boiler is liable for any "loss from an Accident, as defined herein, to an Object, as defined herein . . . ." The definition of "Object" includes "any mechanical or electrical machine or apparatus used for the generation, transmission or utilization of mechanical or electrical power." An "Accident" is defined as "a sudden and accidental breakdown of an Object or a part thereof which manifests itself at the time of its occurrence by physical damage that necessitates repair or replace-

---

[1] Hartford Steam Boiler appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

ment of the Object or part thereof." The reinsurance contract contains a fire exclusion clause that excludes coverage for loss "from fire outside said electrical machine or apparatus or gas turbine concomitant with or following an Accident . . . ." (Internal quotation marks omitted.)

On December 7, 1994, a power transformer owned by Allegheny and located in Middletown, Virginia, was destroyed by a fire. Industrial Risk asserted that the loss was covered under its reinsurance contract with Hartford Steam Boiler. Hartford Steam Boiler denied liability, however, claiming that the loss fell within the fire exclusion clause of the reinsurance contract. In accordance with the terms of that contract, the parties submitted their dispute to arbitration.[2] The arbitration submission, which was unrestricted,[3] provided that the arbitration shall be conducted before a panel comprised of three arbitrators who "will be asked to determine in light of the facts and arguments to be presented during the arbitration . . . the amount of the loss that is reinsured. The arbitrators will be asked to resolve the insurance dispute in accordance with their determination by making an award in favor of either [Hartford Steam Boiler] or [Industrial Risk] as appropriate."

Thereafter, the arbitration panel conducted a hearing on the matter. The parties agreed that the fire had ignited on top of the transformer as a result of the

[2] The reinsurance contract provides in relevant part that, "[a]ny difference of opinion between [Hartford Steam Boiler and Industrial Risk] with respect to the interpretation of this [contract] or the performance of the obligations under this [contract] shall be submitted to arbitration. . . ."

[3] A submission is unrestricted when, as in the present case, the parties' arbitration agreement contains no "language restricting the breadth of issues, reserving explicit rights, or conditioning the award on court review." (Internal quotation marks omitted.) *Industrial Risk Insurers* v. *Hartford Steam Boiler Inspection & Ins. Co.*, 258 Conn. 101, 109, 779 A.2d 737 (2001).

explosion of one of the transformer's bushings,[4] namely, the "H-2" bushing. The parties further agreed that the fire was caused by a fault or defect in the H-2 bushing that resulted in electrical arcing within the bushing.[5] The arcing ignited oil and oil impregnated paper from that bushing. The explosion of the H-2 bushing also made a hole in the transformer, causing oil to leak onto the top of the transformer, further fueling the fire. The fire continued for ten days, consumed thousands of gallons of oil from inside the transformer, and ultimately destroyed the transformer and the other bushings.

Hartford Steam Boiler maintained that the transformer and each attached bushing were separate "objects" within the meaning of the reinsurance contract. On the basis of its interpretation of the reinsurance contract, Hartford Steam Boiler further maintained that, because the fire that destroyed the transformer had originated from outside the transformer,

[4] Bushings provide the means by which voltage from the transformer is transferred to overhead electrical power lines. A report prepared for Industrial Risk and introduced at the arbitration hearing described the bushings involved in the present case as follows: "The . . . transformer had three high voltage bushings (designated H-1, H-2 and H-3) . . . .

"Each of the 'H' bushings was a 'Type O' bushing manufactured by Westinghouse. The bushings were an integral part of the transformer and its voltage-reducing function. The transformer and the bushings were normally sold and delivered by the manufacturer as a single unit. . . . The bushings consisted of a central aluminum tube (positioned inside another tube), condenser paper, and a porcelain cover for insulation. The function of the central tube of the bushing was to conduct electrical current between the power lines and the inside of the transformer. The central tube was inside another tube which served as a mandrel or foundation for hundreds of wrappings of condenser paper. The condenser paper was oil-impregnated, with metal foil on one side and insulation on the other. . . . The bushing was fixed to the transformer by a flange, which was bolted to the top cover of the transformer. The overall length of the bushing was approximately [twenty] feet, of which four feet were inside the transformer and about [sixteen] feet extended from the tank cover to the top of the bushing."

[5] The precise nature of the defect in the bushing that resulted in the electrical arcing never has been definitively determined.

the loss of the transformer fell within the fire exclusion clause of the reinsurance contract. Consistent with this view, Hartford Steam Boiler agreed to pay for the damage to the bushings but not to the transformer. Industrial Risk argued, on the other hand, that the transformer and bushings constituted one "object" for purposes of the reinsurance contract and, therefore, the loss of the transformer was covered under the reinsurance contract because the fire had originated inside, rather than outside, the covered "object."

At the conclusion of the hearing, the panel rendered a decision in favor of Industrial Risk. The decision contains the following relevant factual findings and award: "1. The . . . Transformer and H-2 bushing are deemed to be one 'Object' for purposes of the relevant coverage and exclusions contained in the [reinsurance contract].

"2. The electric[al] arc[ing] caused by a defect in the H-2 bushing together with the immediate release of oil from within the H-2 bushing and . . . Transformer was the direct and proximate cause of the fire that resulted in the loss of the . . . Transformer.

"3. The coverage exclusion in . . . the [reinsurance contract] applies to [loss] originating 'from fire outside said electrical machine . . .' and not from fire originating from within the electrical machine as indicated by the facts presented in this matter.

"4. The Panel thus orders that Hartford Steam Boiler remit the amount of $2,217,537.22 to Industrial Risk . . . within thirty . . . days from the date of this Decision."[6]

---

[6] One panel member dissented. The dissenting arbitrator concluded that the damage to the transformer fell within the fire exclusion clause of the reinsurance contract because the fire had originated outside the transformer. The dissenting arbitrator also indicated that the panel majority had rendered its decision without having spent a sufficient amount of time discussing or otherwise considering the issue presented.

Thereafter, Industrial Risk filed an application in the trial court to confirm the award pursuant to General Statutes § 52-417.[7] Hartford Steam Boiler filed a motion to vacate the award, claiming, pursuant to General Statutes § 52-418 (a) (4),[8] that the arbitrators had "exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made." In support of its claim, Hartford Steam Boiler alleged, inter alia, that the undisputed evidence established that the fire had originated outside the transformer and, therefore, that the fire exclusion clause of the reinsurance contract relieved Hartford Steam Boiler from any liability for the loss of the transformer. The trial court rejected Hartford Steam Boiler's claim and rendered judgment denying Hartford Steam Boiler's motion to vacate the award and granting Industrial Risk's application to confirm the award. On appeal, Hartford Steam Boiler raises the same claim that it raised in the trial court. We are not persuaded by Hartford Steam Boiler's claim.

"Our analysis is guided by the well established standard of review of arbitration awards. Judicial review of arbitral decisions is narrowly confined. . . . When the parties agree to arbitration and establish the authority of the arbitrator through the terms of their submission, the extent of our judicial review of the award is

---

[7] General Statutes § 52-417 provides in relevant part: "At any time within one year after an award has been rendered and the parties to the arbitration notified thereof, any party to the arbitration may make application to the superior court for the judicial district in which one of the parties resides . . . for an order confirming the award. The court . . . shall grant such an order confirming the award unless the award is vacated, modified or corrected as prescribed in sections 52-418 and 52-419."

[8] General Statutes § 52-418 (a) provides in relevant part: "Upon the application of any party to an arbitration, the superior court for the judicial district in which one of the parties resides . . . shall make an order vacating the award if it finds any of the following defects . . . (4) if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made."

delineated by the scope of the parties' agreement. . . . When the scope of the submission is unrestricted, the resulting award is not subject to de novo review even for errors of law so long as the award conforms to the submission. . . . Because we favor arbitration as a means of settling private disputes, we undertake judicial review of arbitration awards in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution. . . .

"Where the submission does not otherwise state, the arbitrators are empowered to decide factual and legal questions and an award cannot be vacated on the grounds that . . . the interpretation of the agreement by the arbitrators was erroneous. Courts will not review the evidence nor, where the submission is unrestricted, will they review the arbitrators' decision of the legal questions involved." (Citations omitted; internal quotation marks omitted.) *State* v. *New England Health Care Employees Union, District 1199, AFL-CIO*, 265 Conn. 771, 777–78, 830 A.2d 729 (2003). In other words, "[u]nder an unrestricted submission, the arbitrators' decision is considered final and binding; thus the courts will not review the evidence considered by the arbitrators nor will they review the award for errors of law or fact." (Internal quotation marks omitted.) *Industrial Risk Insurers* v. *Hartford Steam Boiler Inspection & Ins. Co.*, 258 Conn. 101, 110, 779 A.2d 737 (2001).

"The resulting award can be reviewed, however, to determine if the award conforms to the submission. . . . Such a limited scope of judicial review is warranted given the fact that the parties voluntarily bargained for the decision of the arbitrator and, as such, the parties are presumed to have assumed the risks of and waived objections to that decision. . . . It is clear that a party cannot object to an award which accomplishes precisely what the arbitrators were authorized to do merely because that party dislikes the results.

. . . The significance, therefore, of a determination that an arbitration submission was unrestricted or restricted is not to determine what the arbitrators are obligated to do, but to determine the scope of judicial review of what they have done. Put another way, the submission tells the arbitrators what they are obligated to decide. The determination by a court of whether the submission was restricted or unrestricted tells the court what its scope of review is regarding the arbitrators' decision." (Citations omitted; internal quotation marks omitted.) Id.

"Even in the case of an unrestricted submission, we have . . . recognized three grounds for vacating an award: (1) the award rules on the constitutionality of a statute . . . (2) the award violates clear public policy . . . [and] (3) the award contravenes one or more of the statutory proscriptions of § 52-418." (Citations omitted.) *Garrity* v. *McCaskey*, 223 Conn. 1, 6, 612 A.2d 742 (1992). General Statutes § 52-418 (a) (4) provides that an arbitration award shall be vacated if "the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made."

"In our construction of § 52-418 (a) (4), we have, as a general matter, looked to a comparison of the award with the submission to determine whether the arbitrators have exceeded their powers. . . . We have also recognized, however, that an arbitrator's egregious misperformance of duty may warrant rejection of the resulting award. In *Darien Education Assn.* v. *Board of Education*, 172 Conn. 434, 437–38, 374 A.2d 1081 (1977), we noted that '[i]f the memorandum of an arbitrator revealed that he had reached his decision by consulting a ouija board, surely it should not suffice that the award conformed to the submission.' " (Citations omitted.) *Garrity* v. *McCaskey*, supra, 223 Conn. 7–8. "Other states have also recognized that an arbitrator's

egregious misperformance of duty or patently irrational application of legal principles warrants review and rejection of the resulting award." Id., 9.

"[A]n award that manifests an egregious or patently irrational application of the law is an award that should be set aside pursuant to § 52-418 (a) (4) because the arbitrator has 'exceeded [his] powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made.' We emphasize, however, that the 'manifest disregard of the law' ground for vacating an arbitration award is narrow and should be reserved for circumstances of an arbitrator's extraordinary lack of fidelity to established legal principles." Id., 10.

"In *Garrity*, we adopted the test enunciated by the United States Court of Appeals for the Second Circuit in interpreting the federal equivalent of § 52-418 (a) (4). . . . The test consists of the following three elements, all of which must be satisfied in order for a court to vacate an arbitration award on the ground that the arbitration panel manifestly disregarded the law: (1) the error was obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator; (2) the arbitration panel appreciated the existence of a clearly governing legal principle but decided to ignore it; and (3) the governing law alleged to have been ignored by the arbitration panel is well defined, explicit, and clearly applicable." (Citations omitted.) *Saturn Construction Co.* v. *Premier Roofing Co.*, 238 Conn. 293, 305, 680 A.2d 1274 (1996).

Upon application of these principles, it is clear that the trial court properly confirmed the panel's award. There can be no doubt that the award conformed to the submission: the task of the panel as prescribed by the submission was to determine whether the loss of the transformer was covered by the reinsurance con-

tract, and that is precisely the issue that the panel decided. Hartford Steam Boiler nevertheless contends that the award manifests "an 'egregious or patently irrational application of the law' " because the award rests on factual findings that, according to Hartford Steam Boiler, are wholly unsupported by the undisputed evidence. As we have stated, however, courts do not review the evidence or otherwise second-guess an arbitration panel's factual determinations when the arbitration submission is unrestricted. See, e.g., *State* v. *New England Health Care Employees Union, District 1199, AFL-CIO,* supra, 265 Conn. 778. Even if we were to assume, however, that Hartford Steam Boiler's contention gives rise to a ground for vacating the award that falls within the narrow scope of § 52-418 (a) (4), we reject Hartford Steam Boiler's contention as unfounded. The evidence indicated that the fire that destroyed the transformer was caused by electrical arcing within the H-2 bushing that caused that bushing to ignite. In addition, the panel reasonably concluded that the transformer and the bushings together constituted one "object" for purposes of the reinsurance contract. See footnote 4 of this opinion. Thus, the panel's ultimate determination that the loss of the transformer was not excluded from coverage under the contract's fire exclusion clause also was perfectly reasonable: because the fire originated in the H-2 bushing, which itself was a part of the covered "object," that fire originated inside, rather than outside, the object. We therefore conclude that the trial court properly confirmed the arbitration award.[9]

---

[9] Hartford Steam Boiler also argues that there was no evidence to establish that the fire originated within the H-2 bushing. We reject this contention because, as Hartford Steam Boiler expressly stated in its brief to this court, "[t]he oil and oil impregnated paper from the [H-2] bushing caught fire on the top of and outside of the transformer tank, ignited by an electrical arc that came out of the bushing." Those facts alone support a finding that the fire originated in the H-2 bushing. Moreover, as we have noted, Hartford Steam Boiler has acknowledged liability under the reinsurance contract for the loss of the H-2 bushing because, as it stated in its prehearing submission

The judgment is affirmed.

In this opinion the other justices concurred.

to the panel, "the damage to the bushings . . . constituted an 'Accident' to a covered 'Object' under the Policy." That acknowledgment by Hartford Steam Boiler belies its contention that the evidence does not support a finding that the fire originated in the H-2 bushing because, if the fire had started *outside* the H-2 bushing, then the damage to the bushing *itself* necessarily would have been excluded under the fire exclusion clause of the reinsurance contract.